Good morning, Your Honors. May it please the Court, my name is Maureen Scott, and I'm representing the Arizona Corporation Commission in this matter. I will be sharing my time today with Mr. Jeff Oxley, who represents Mountain Telecommunications. I will take the first 12 minutes. Mr. Oxley will follow with 5 minutes, and I would like to reserve 3 minutes for rebuttal. The Arizona Commission is appealing an adverse ruling by the Arizona Federal District Court involving an appeal by Qwest Corporation of one of the Commission's orders in a generic wholesale pricing docket conducted under Section 252 of the Federal Telecom Act. The District Court vacated part of the Commission's order on the grounds that it violated the retroactive rate-making rule, and based upon the Court's belief, which was in error, that there was a unilateral mistake on the part of the SELEX, and not a mutual mistake as the record supported. A mutual mistake that was shared by all parties. The Commission therefore asked the Court to overturn the District Court's ruling and to affirm the Commission's order. The District Court order, the Commission feels, ignored evidence in the record as that there was a mistake, that it was mutual, and also that given the circumstances in this case, the retroactive rate-making rule should not apply. The particular issue or network elements at issue in this case were set in Phase 2 of the Commission's proceeding. They are dedicated transport and entrance facilities. Phase 2 addressed other rates as well. The Commission's order became effective in June 2002. Quest, however, did not implement that order until approximately January 2003, despite the fact that the order became that there was no good reason for the delay, and the Commission fined them approximately $190,000. Yeah. Does that take care of the delay, or do you contend that there was some other significance we should apply to that delay? Yes, Your Honor. That's an excellent question. That docket alone did not take care of the issue with respect to what happened in this pricing docket. Because of Quest's delay in implementing the billing, it was impossible for the SELEX to understand the impact that the combined rate would have on them. So it wasn't until seven months later that Mountain Telecommunications ---- But they knew if they read the Commission's order, and did some backtracking, I suppose, they would know that there was a combined rate. They just wouldn't know what it was. Is that right? They would know that the rate had been combined, but the combining of the rate was not done, was not advocated by the SELEX, first of all. While they supported the HAI ---- But your question is one of them. I think the issue is one of notice. And there's no doubt that everybody knew the rates were combined in Phase 2, which would put them on notice. They're going to be charged for services which they weren't receiving, which they didn't need, right? Regardless of how much it was, I think the amount was a surprise. But they should have been on notice that they were going to pay an additional amount because the two services had been combined in a unitary charge. Your Honor, the two services were only combined because the record did not ---- the record demonstrated or indicated to the Commission that every SELEX that took a dedicated trunk ---- But that's not the question right now. It's a very discreet one. Do you know where ---- I did find in the record the list of actual costs that came out in a joint rate? That would have been in the testimony of the SELEX. It's in the testimony. But it's not in terms in the order. Is that right? Is it in the order? If somebody just read the order, would you know that? That the Phase 2 order, yes. You would know that the rates were combined, that the Commission adopted the HAI model at the urging of Quest. Well, you'd have to then go read the model to know it, or was it actually in the order? Your Honor, it was in the Commission's order. I see. And the SELEX ---- So why wouldn't the SELEX be on notice that they were probably going to be charged for? Your Honor, when the Commission issues an order in a rate proceeding such as this, the company Quest then will file a compliance filing, and the compliance filing will set forth the new prices. Right. No, I understand they wouldn't know the precise impact of it, and maybe that's significant. But they at least would have to know they're going to pay more. Because you have two charges that are being merged into one. They didn't need one service. So theoretically, under any pricing scheme, they were going to be paying more than they would under a scheme which Quest had proposed where there would be separate charges, right? Yes. And, Your Honor, the average increase that was calculated for carriers that took both entrance facilities and direct trunks transport was only 70 percent. Yes. Because of the mistaken assumption on the part of all parties, we have carriers such as MTI that don't take or use entrance facilities, and their bills went up 78 percent. Let me ask a more fundamental question I don't quite understand from the record, and that is how Mountain States and other similarly situated companies would be affected by this arbitration. In other words, why is the rate set for them as with everybody else? Is it because of a provision in their contracts individually, or is it a provision of law under the way Arizona works, or what? Quest is the predominant ILEC in Arizona, and generally the commission has set uni rates for Quest in a separate docket because it serves the bulk of the territory in Arizona. Doesn't that kind of get down to the heart of the question of whether this is rate making or adjudication? I mean, if the commission were exercising state power in setting the rate, that's more like rate making. If it's an adjudication that affected everyone by the terms of contract or something, some other operation of the regulations or something, then maybe it's more like an adjudication. I think, Your Honor, it has qualities of both. The commission in setting rates, that is more or less a legislative function, but under the Section 252 of the TELCOM Act, the arbitrations are conducted in more of an adjudicatory fashion. I have a somewhat question that wasn't addressed in the briefs, I don't think. But is there any argument that the rate runs from the time of the challenge? The new rate is nonretroactive if it runs from the time of the challenge. In other words, Mountain States here filed an injunction and a challenge to the Phase 2 rate in January of 2003. Is that right? It could have taken a month or it could have taken a year to decide that. The retroactivity issue is being posed as running from when the opinion was issued, the order was issued in the supplemental proceeding. Is there any argument that it runs from the time when the proceeding commenced? My understanding under the Federal, the FPA, is that under Section 206, it runs, there's an effective date from when the challenge occurs. Is there any argument that that occurs here? Your Honor, I think it would be my opinion that it would be retroactive or that it should go back to the date when the commission's order became effective rather than when. I understand that. But I'm asking in the alternative, is there, if we're looking at retroactivity, do we consider retroactivity as running? Because, of course, by the time the challenge was issued, people knew there was at least a possibility that wasn't going to be the rate. And plus, there's an equity involved, which is that it could go on forever. And why should the rate payers be burned with the delay in the system? So my question is, is there any precedent, any argument? Have you argued or has anybody argued that the retroactivity date should start from when the challenge occurred? Your Honor, I understand what you're saying. It was not in this case, and I believe primarily because of the misconduct on Quest's part in delaying implementation of the bill. That's after this. I'm asking you, from January 2003, when people did know the impact, right, why don't we run any retroactivity inquiry from then? Again, Your Honor, if Quest had billed these rates within 30 or 60 days, as they were supposed to have under the commission's order, the problem would have come to the commission's attention 4 months earlier than that date. I understand that, but I'm asking a conceptual question. All right, let's suppose it had come to them 4 months earlier. Why doesn't it run from then, from whenever it was that an actual proceeding began? I understand what your position is. It goes back to June 2002. But suppose we were looking at another alternative. Yes, I think that that is an option that the Court could consider. Is there any precedent for it? I'm not aware of any offhand, Your Honor, in a case like this. Okay. It's the commission's position that the facts and circumstances of this case put it retroactive rate-making principle completely. Here, Quest was charging companies for facilities that they were not receiving at all. This goes far beyond a mistake in projections, which will even out over time. In addition, when the commission set the rate, it presumed or found that the rate was just and reasonable under the Telecom Act only for carriers that took entrance facilities and direct trunk transport together. Nowhere in the order is there a finding that that combined rate would be just and reasonable for carriers that only took direct trunk transport. But, Claire, you said that there is something in the order that says that there is a combined rate. Where is that? There's a discussion under R, transport. Is that where you're thinking of? I believe, Your Honor, that there is a discussion on page 6 of the order. 6 of the order. Wait. I'm sorry. Wrong order. No, I don't see that. If you look at the do you have the phase 2 order, Your Honor? Yes, I do. Is that what you're looking at? Yes, I do. Please bear with me one moment while I. Perhaps you can do it in rebuttal because you're running out of your time. Okay. You're down to seven minutes, so you're into your college time. Okay. If you want to save some time for rebuttal. Thank you, Your Honor. Good morning. May it please the Court. I'm Jeff Oxley. I'm general counsel for Mountain Telecommunications. I'd like to address two points this morning. First is MTI, you didn't participate down below. Why does that not toss you out of the ballgame? And second, the point about whether the decision to combine the rates was a mistake or not. As to the first point, the Act doesn't require that companies participate in rate making. 252I of the Telecom Act allows small companies or any company to opt into agreements that have been approved by State commissions. Those agreements could be arbitrated agreements or negotiated agreements. Now, have you opted in in advance? In other words, could you have, once this agreement was announced, have said we want our own agreement and started all over again? I could have petitioned Quest for a new agreement at that time, yes. And that would have brought me to the issue of what should be transport rates. If Quest and I couldn't agree on them, then we'd do an arbitration and I would be, as a small company, required to bring in cost and expert witnesses to litigate this issue. It's not something that small companies can do. Well, let me ask a more fundamental question because it's kind of a dumb question. But why does this arbitration bind you in the first instance? Our interconnection agreement. I see. Quest provides that when the commission changes a rate, the rate in our interconnection agreement will change, too, to correspond to the commission. So it's because of your contract with Quest that you're bound by the interconnection rate set by the commission? Yes, Your Honor. I see. Okay. At some points, there's references in the briefer that claim that the retroactivity issue might be governed by individual agreements. I don't even know if we have your individual agreement in the excerpts. I don't remember seeing it. Is there anything in your individual agreement that pertains to the retroactivity question? The agreement says in Section 9.3, I think it is, that the rates in Exhibit K to the agreement or B to the agreement, I forget the name, will apply until the commission orders a rate change. But if the commission orders a rate change, Quest will make a compliance filing and the new rates will thenceforward apply. I see. So you've both obligated yourself to the rates and essentially obligated yourself to their effective date as well. What we felt we obligated ourselves to was having rates set by the Arizona Corporation Commission in compliance with the Act, rates that were based on cost, rates that separately priced the different piece parts of the network. All right. But how do you distinguish yourself from the Arizona grocery case and that whole line of cases? I mean, obviously, in all those cases, somebody thinks there was a mistake made. Maybe not such an egregious mistake, but a mistake. Well, I guess I would distinguish in two ways. One, in the Arizona grocery case, there wasn't an explicit prescription of the rules for establishing these rates that the ---- Well, I said it was an unreasonable rate. That's against the rules. It's supposed to be a reasonable rate. Well, and the Act and the FCC rules go much further in defining what a reasonable rate is. They say it must be cost-based, and the rules are pretty detailed. So what we had in this case was a rate that wasn't related to cost because the rate for dedicated transport, which we bought, included another piece that we didn't buy. Now, could you have told that from the Phase 2 order? No. I don't believe you could have told that from the Phase 2 order. Why not? Is there anything in the order that says that? Well, because the commission is thinking that, and everybody is thinking that, you buy both of these things together. All right. But what are the actual words of the order that are relevant to this? I don't know. I don't know. But going back further, in Phase 1, Quest proposed unbundling, complete unbundling. And they were opposed to that filing. And they said, no, let's put these two together. Now, at that point, you were monitoring this. Weren't you on notice that you were going to get charged for a service? You potentially were going to get charged for a service that you weren't going to use or didn't need? Your Honor, the issue of combining rates didn't come up until there was a recommended order from the ALJ, and we were discussing exceptions to that order. MTI wasn't there at that time, but you had the recommended order, and Quest comes in and says, well, even though we proposed separated rates, we think you should combine rates. And they give a couple of reasons for combining rates, but I think this is the reason that the Court went with below. The compelling reason for adopting the HAI model for transport is that it is the only model that does combine direct transport with entrance facilities. These are two types of facilities that I have mentioned earlier that have distinct cost features, and it's a significant benefit of the transport model, AT&T's model, that it combines both in the rate that it produces. Well, that was from Quest's attorney to the commission, and that left the commission with the idea that it's a good idea to combine these rates. How could it possibly be good? Well, everybody buys both of them at the same time. You couldn't say that it's a good idea to combine rates for two things when most people only bought one thing. You just couldn't do that. This is the unspoken assumption that's percolating through all of the adjudication that's going on. Well, it was said, I think it was said at least once affirmatively by AT&T that this is something that everybody did this, something like that. Was there any affirmative representation? Affirmative representation. That everybody buys both. AT&T only distinguished between length. AT&T said some people buy longer, some people buy shorter. Nobody on the whole record said anything that said some people don't buy entrance facilities at all. They built their own. That's what we did as a CLEC. We invested in building our own network facilities like we're supposed to do. We're not a litigation machine. We're an ant. We didn't go in to dance with the elephants. AT&T, Quest, MCI. MCI is just this little bitty carrier. And, yes, we got nailed by the result. Was it reasonable to expect us to go in and do battle with these other folks in a prolonged proceeding? I don't think so. The Arizona ---- Well, here you are. Yes, sir, and it's my great honor to be here. You have gotten into battle with these giants. And you could have done it earlier. You're just saying it's a matter of cost. Yes. Why is that relevant? Because the Act was trying to break open the market for competition. The Act said there are lots of ways to enter the local markets. We know that some companies will be able to do these arbitrations, but we also know that others won't. And under 252I, they can adopt in ---- opt into agreements that State commissions have arbitrated and have established terms and conditions and rates that compose the Act. But certainly this problem, that is that not everybody does everything the same way, can't be unique to this particular problem ---- issue. I mean, the entry and the transport. I mean, there must be other circumstances in which AT&T isn't going to represent your interests. Yes. And so what do you do about that in terms of it not showing up? Your Honor, that is a great problem facing the SELEC industry right now. We've lost AT&T and MCI. They've become the ILECs again. So there are companies like mine here today arguing with you. We do participate now in cost cases, but it's a tough world out there. And we were relying on the commission here. How many companies are similarly situated to you with respect to the entrance facility issue? Your Honor, I believe Time Warner Telecom was. Yes. Anybody else, do you know, to your knowledge? Not to my knowledge, no. Okay. Is there any way at all that this can be made up to you? I mean, you've paid millions of dollars. We've in fact paid nothing. Is that right? That's another question I have. Well, we actually paid the amount that's at stake for us here is about $1 million. All right. Now, is there any way at all that you can get that made up to you, that you're facing having to pay a million dollars for something you never got? Is there any way you can get that made up some way or another? We thought if we went to the Arizona commission and complained about the rate, that that would do it, and it looked pretty good. I mean, I don't know of anything else you can do. I know of nothing else. Basically, it's a stranded cost. Is that what you're saying? You can't pass it on to your consumers or not? It's a very competitive marketplace, the telecommunications marketplace. I see. You could, but it would affect your competitive rates. Yes. I see. Okay. Thank you, Your Honor. Yes. Thank you very much. We'll hear from Quest. Good morning, Your Honors. John Devaney on behalf of Quest. I'd like to begin by first addressing this question of notice. And I'd like you to think a little bit, too, about it. It looks as if Quest is going to get paid approximately a million dollars for services it never provided. That seems wrong to me. And couldn't you make that up to Mountain Telecom in some way between the two of you? Well, Your Honor, let me first address, if I could, the implicit question that it's wrong for us to collect these charges. May I address that? It's wrong to what? For us to collect these charges from MTI. Yeah. Yeah. Let me, if I could, just explain. It's not the order. And you've got law that seems to be on your side that says we cannot go back and do anything about it. Everybody is just stuck with it. But it looks to me like you're getting a million-dollar windfall that you shouldn't get. Well, there are two points I'll make. Why is that not right? Two points that I'll make in response. First, when the origin of this rate is that the commission decided to use the AT&T-sponsored HAI model to develop the rates for all unbundled network elements. And what the HAI model does is it spreads common costs across all unbundled network elements. And when the commission decided to use the HAI model for most network elements, as it found, consistency required that it use HAI for transport. Because if you didn't use it for transport, then Quest would not be able to recover its common costs. But not to combine the costs. And there's nothing inherent, as I understand it, in the HAI model that would require that these costs be combined. The explanation for why they were combined was that they didn't have the information to split it out. They never really intended to use this for transport, to use the model. So there's nothing inherent in that model that requires that they be combined. It seems to be inherent that they be costed differently. In other words, but not that they be combined in the schedule. You could just break it out. As you advocated in the supplemental proceedings. And we did. And we rejected on that. But the model as presented in Phase 2 by AT&T, which had to be used in order for us to combine the two facilities. But there was nothing inherent that made it combined. And that's just not a very good argument. It happened to be combined. But you could have had the same cost spreading by breaking out these two costs, couldn't you have? Well, we didn't sponsor the model. AT&T sponsored the model. And they did not break it out into two different elements. We weren't in control of their model. But I gather, if I understand where you're heading with this, what you're saying is, if we're going to turn back the clock, we have to turn it back on everything, split it off. But I think Judge Thompson is asking a slightly different question. That is, you have here a relatively minor player in this. And I don't know how much time or what's at stake with Time Warner or any of the others. Is this the kind of issue that might be susceptible to a settlement? I now understand very directly your question. I suppose that the parties could discuss that. I don't know what discussions, business to business, may have taken place to address this issue. But I consider it to be more conceptually. And whatever you say about settlement is nothing, no bearing on our decision. Please rest assured about that. But conceptually, that could occur. I mean, in other words, there's nothing legally preventing you from making a deal on this. Conceptually, that is correct. And I'm not sure that there's any other entity that could take into consideration your cost loss because of a lack of retroactivity as to this particular entity and also the fact that they were paying for services they didn't get. Conceptually, that is correct. Am I correct, though, in believing that there are other entities also affected and that we're not talking about a million dollars, we're talking about more like $8 or $9 million? That's correct. Aside from Time Warner, are there others? I don't know, aside from MTI and Time Warner. Time Warner would be the biggest. I would assume that's correct. And by the way, Time Warner did participate in this proceeding. They were there for the cost docket. Could you tell me where in the order it says that there's a combined? I'm sorry. I'd have to thumb through the order. Isn't that important? I mean, if the question is whether there was, in fact, notice at the time, and everybody is saying there was. It may be here, but I'm not finding it. It says in high verba that these are combined. I can tell you this. Can I go back one second and just address one earlier question and then I'll return to you? I wanted to just point out with respect to your question about why we shouldn't return what we've gained, I do want to point out that as soon as this issue was brought to our attention, we did not object to having a prospective change. And we went through that proceeding. But you did, actually, because this is my other question. You objected, you didn't, you haven't ever said, okay, let's go retroactive to January 2003. That's correct. What we did say is we will be happy prospectively to have separate rates for entrance facility. Well, why didn't you say as of January 2003, which is when the issue was raised? Well, we did very shortly thereafter agree to a proceeding whereby the parties would break out. You're now arguing that you're going to get the money from January 2003 until October 2003, right? As well as the money back to June, to 2002. Well, actually, no. As soon as the new entrance, as soon as the new transport rates were put in place. Yes. When was that? That was sometime in 2003 at the conclusion of the settlement. I think it was in the fall. But in any event, it was well after the issue was raised and you knew about it. That's correct. Once new rates were put in place, we advocated. This doesn't seem helpful to me for you to get up and represent that you're being the good guys here. You could have said in January 2003, oh, yes, okay, we don't want to go you can't go back, but as of now, you're right. But you didn't do that. My only point is that when the issue was brought to our attention, in that subsequent proceeding, we endorsed having separate rates for entrance facilities and direct run transport. We did endorse that. And in response to your question about where it's stated in the record that these elements were combined into one rate, I want to point out the compliance filing that Quest made following the Phase II proceeding not only identified direct transport and entrance facilities as being combined, but it set forth the price, the combined price. So the notion that MTI could not have known about the price. Well, they did know. They said they knew as soon as they got that. No, they don't. They didn't say that. They said they knew when they got the bill. Exactly. So it was about a month's time. So it was about a month there. Right. So there was a compliance filing. Moreover, during the hearing itself, and I was Quest counsel in that very lengthy evidentiary hearing, these cost models were presented and they were debated and it was known that one model combined entrance facilities and direct trunk transport and one did not. There was a subsequent oral argument on this precise issue of transport after the and then there was a compliance filing that set out the rates. I understand MTI's resource concerns, but they didn't have to be there day in and day out presenting their own witnesses and their own cost models. They could have been there just to monitor the proceeding, which many CLECs do in these cost dockets. So I understand the resource constraints, but it's not an excuse for not keeping apprised of what was happening in the cost case. Is your understanding of the legal precedence that if we disagreed with the district court with regard to whether there was substantial evidence for the finding that there really was a mutual mistake, would that be a reason for not doing retroactive rates? No. The rule against retroactivity does not have an exception for mistake. It has exceptions for judicial review. If there's a judicial review taking place, parties are on notice, the rate might change and therefore shouldn't be able to rely on it. There's an exception to the rule against retroactive rate making. If there's fraud in the development of the rate, sort of an injustice done to the Commission. So why weren't you on notice at least by January 2003 that the rate might change? Well, because the Commission's order had long since been final. The period for judicial review of that order had long since expired. Right. Sure. But they were asking the Commission to change it, and the Commission staff said that, yes, they had a mistake. There was at least a good chance that the rate was going to change. Well, only if the Commission violated, in our view, the Act and the rule against retroactive rate making. There was no possibility at that juncture that a court could change it because the statute of limitations had expired. Well, that's – but you had a pending proceeding at that point. We had challenged it, but we hadn't challenged the transport rate. We didn't challenge it at all. So there was certainly no notice from us that the transport rate would change, because that wasn't the subject of our judicial review. But wouldn't, if there were a change – because it was your position that the whole thing was interdependent. So if you, in fact, prevailed on your challenge, wouldn't you have to go back and start over again? Well, we challenged just the loop rate and nonrecurring charges. I understand that. But it was also your position, as you described earlier, that all the rates were interdependent and that the costs were spread over all of the various rates. So if there were a change in some of the rates, wouldn't that – wouldn't you go back to the Commission and start again? There would be a possibility of some change to the transport rate if, indeed, we had prevailed. But we, as you know, dropped our appeal as part of the settlement. But well after all this? The timing was – I think it was after the supplemental order, wasn't it? I'm having trouble remembering if it was after the supplemental order. I'd have to check that. On a fundamental level, let me take – let's take this back a bit. The States don't have any authority to set rates under the Telecommunication Act, right? They do have authority under the Act. Well, only – only – Congress. Well, it's – yes. If you – if there's a – if you don't settle with them, then they have the power to set arbitration and resolve the arbitration. That's the only way they can come into rate – they can issue a rate, right? That's correct. And, in fact, the only way Mountain is involved in this is because of their separate contract with you, not because of the inherent – any rate-making authority by the Arizona Commission, right? Mountain is involved because by terms of the interconnection agreement we have with them, they are bound by the rates ordered by the Commission. The Commission could not on its own say, all right, Mountain, this is the rate we're going to set for you absent the interconnection agreement, which ties into that rate, right? That's correct. So why isn't this quintessentially just an adjudication and not a – not rate-making at all? Well, because this is a – a prescription of future rates that – that the Commission ordered. It's very much like the rates at issue in Arizona Grocery, where you have a commission establishing rates to be applied prospectively, and that's what we had, and it was incorporated into the interconnection agreement. It did take place in a – in an adjudicatory proceeding, but it's a prescription of prospective future rates. Only – only because you couldn't agree by contract, though. I mean, the odd thing about – I mean, I take your point. I understand it looks a lot like rate-making, and it may be rate-making because it applies to everybody because of the interconnection agreements everybody seems to know about but aren't part of the record. But at its core, the Commission doesn't have the power to set rates at all, except by failure of the party's contract. And so it's different. For me, it's a little bit different. It seems different from the – what I would view as the paradigm of rate-making where you say, okay, we're going to establish this tariff or rate. We're going to have – here's the notice. We're going to have hearings, and this is going to be the rate.  And it's very clearly set forth in 252A1, I believe, that if the parties cannot reach agreement on terms and conditions, including rates, then, yes, at that point, a commission should step in and arbitrate unresolved issues, including rate issues. And then there are criteria commissions must apply in establishing rates. To me, that's rate-making. The Commission sets rates that are applied prospectively that have the effect of a statute, I mean, of a tariff. These are binding rates. The Quest has no discretion not to charge. It must charge them. I gather that you are challenging, and the district court agreed with you, the Commission's finding that there was a mutual mistake. Can you tell me on what basis you're doing that? Yes. First, there's no evidence in the record as to assumptions of parties as to the buying patterns of SELEX, as to whether they did buy entrance facilities or didn't separate from direct trunk transport, with the exception of the AT&T comment you pointed to earlier. Which seemed to say in terms that, you know, sort of offhandedly, well, of course, everybody does both. Right. And then, in addition, Quest did put in its own cost model that broke it out separately. So this issue of certainly the opportunity for parties to comment on whether the buying habits were there was. But Quest, in all of its discussion about why you should combine the costs, never said, it seemed, I mean, having read the stuff, seemed to be making the same assumption. And in fact, then in the supplemental proceeding, the person who testified essentially said, well, we, the regulators, actually didn't know. I mean, the billers probably knew in Quest, but we didn't know. So if nobody knew, then there's no evidence that anybody knew. Why isn't that a mutual mistake? Well, Time Warner was there at the proceeding. They buy direct trunk transport. That's true. But what is also true, as Ms. Millian said, is that the people who do that and the people who were in the proceeding are not the same people for you as well. In other words, the Quest, somebody at Quest had to know this, but apparently the people who were representing you in the proceeding didn't know it. They said, she said she didn't know it. Well, certainly no CELIC had raised the issue of we want to buy these separately. And so Quest, it was not on notice that it needed to present a witness. That's a different issue. I mean, the question still is, and I understand your position is that the mutual mistake doesn't matter. Right. But in terms of whether there's substantial evidence that there was a mutual mistake, why isn't the record to support that? Well, again, there's nothing in the record other than the points that I just discussed. Which record are we talking about? The record of Phase II or the record of the supplemental proceedings? Phase II. Why isn't it the record of the supplemental proceedings we're looking to? Well, I think that you have to justify retroactivity under the theory that you're pursuing. And I don't agree mistake justifies it. But if it did, you have to focus on the Phase II proceeding, I think, to see if there were. But if nobody understood it, then nobody was going to talk about it. It was in the next proceeding in which people were now focused on it that we have a hearing about whether people understood it earlier. Well, again, I go back to Quest presented a cost model that broke it out separately. Ms. Million did testify later. But there was never any testimony that the reason they broke it out separately was because some people bought one and not the other. They had different reasons why they broke it out separately, not that reason. Well, the issue had really never been teed up. So, yes, there was not testimony from Quest that this is why we're doing it. But I think it's somewhat implicit that if you're presenting two unbundled elements, they're available for purchase separately. And, moreover, as you said, the AT&T statement is in the record. So I don't think there was a mutual mistake about this, even if mistake could serve as an exception to the rule against retroactive rate making. The other quick points that I would like to make, the Act, as you know, this Court has held that interconnection agreements have the binding force of law. And the effect of the Commission's ruling in this case is to retroactively apply rates that were not in the interconnection agreement to transactions that had already taken place. And that violates, in our view, the binding effect of interconnection agreements. So the change that's going to be made certainly can be made prospectively, but to retroactively change terms of an interconnection agreement is not consistent, we believe, with the Act or with this Court's decision in Pacific Belle v. Packer. Kagan. Why isn't one way of looking at this that there just wasn't a rate for direct transport purchased separately? I mean, if you – it's not that the right was wrong. There just wasn't one. Because if you look at the – even the compliance document, and it says, you know, there's a rate for entry combined in direct transport, so there's a rate for entry as combined with direct transport, but there is no rate for direct. But if somebody isn't buying entry, then there doesn't seem to be a rate for them. Well, there's a rate for dedicated transport. And dedicated transport includes – Which includes entry. But if you're not buying entry, then there's no rate for you. There just isn't one. There's a rate for combined direct transport and entry, but there's no rate for just direct transport. That's correct. That's what the commission – So why isn't one way of looking at this, not that there was a mistake in the rate or that it's a retroactive rate. There just wasn't a rate. Well, one could acquire entrance facilities by paying the overall dedicated transport rate. So in that sense, there was a rate. I think your point is there was not a separate rate for entrance facilities,  There's a combined aggregated rate for dedicated transport that included both rates. But usually if you aggregate something, it's because somebody has both of them, not because somebody – if I go out to buy, you know, a computer with a operating system, then I'm paying for a computer with an operating system. But if I go out to buy just the computer without the operating system, and I say, what's the rate for that, they either do or they don't have a rate for it. You didn't have a rate for direct transport without entry. Well, we actually – I understand. You weren't the responsible person. We actually did, but the commission rejected our proposal and adopted the Hatfield model, the HAI model, that had the combined rate. And at that point, we said, well, if you're going to do that, to give us full compensation, you've got to use the HAI model for transport, because if you don't, we don't recover all our common costs that we incurred to provide these unbundled network elements. I have one other question. Is it – as I understand it, in fact, these rates have never been paid? Or maybe we're – That is correct, although as part of the litigation, the parties entered into – oh, it has been paid. I stand corrected. They had not initially been paid, but the district court – I thought that there was a stay. Oh, since the district court. Oh, I see. I didn't know that. Okay. Are there any further questions? All right. Your time has expired.  Thank you very much. We'll give you three minutes for a vote. Thank you, Your Honor. Judge Bertone, the discussion that you had asked me to identify in the order earlier begins on page 78 of the Phase 2 order. I'd like to just answer another of your questions that you posed earlier to Quest's counsel. Thirty-two carriers were impacted by the combined rate. Well, wait a minute. Let's go back. So it says – it does say that the outputs derived from the HAI model for transfer rate should be adopted. So you'd have to go back to the HAI model to know what that was. And then it says that HAI develops average pricing rather than breaking transport into a fixed piece and adding a per-mile charge. But my understanding is that that's a different issue. That doesn't deal with combining entry and transport. It has to do with whether you – what they wanted to – what it does is it has a per-mile charge rather than an overall price is what they wanted. So where does it say that it combines entry and transport? After looking at this discussion, Your Honor, I don't believe it does. Okay. We – it's the commission's position that this Court – that the retroactive rate-making principle is grounded in equity. May I stop you there? You said there are 32 carriers? Yes, there are, Your Honor. Involved that only purchase transport and not entrance? Yes. That's my understanding based upon the record. Okay. Therefore, this Court has the power under equity to remedy what is a wrong here. And we believe this case, again, falls outside of the retroactive rate-making principle discussed in Arizona Grocery because there was misconduct involved. But the commission didn't ground its order on misconduct. It founded its order on mistakes. So how can we get into the alleged misconduct here? I mean, that's something entirely new, isn't it? Not really, Your Honor, because there was a lot of discussion in the Phase 2A proceeding regarding the fact that the SELEX really didn't receive notice of the impact of these rates until they received their bills, which was six to seven months later. All right. But that, just to argue, that takes care of the six to seven months, even if, let's assume, we agreed with that. What about the rest of the time? The rest of the time, the whole rate was set based upon a mutual mistake of fact. The commission and all of the others. But that's not misconduct. You're arguing on two discrete feet. I mean, misconduct's one thing, mistake's another. Yes. Do you have authority for the notion that a mistake would be an exception to the retroactive rate-making rule? Your Honor, we cite a number of cases in our brief and reply brief where retroactivity has occurred when there has been a mistake in the rate-making process. I have to concede, though, the facts in those cases are not identical to the facts in this case. But in addition to that, Quest here is advocating the use of the retroactive rate-making rule to charge for a service it doesn't provide at all. And this was never the intent of the retroactive rate-making rule. But part of, I think, the problem with Quest is that they've, with the integrated rate, they've combined costs. And so if we go apply retroactivity here, why don't we have to apply retroactivity in terms of breaking out the transport cost too, or the entrance fee cost as well, and charge a separate rate back to all the other carriers? That's part of their point, is if it's going to, you know, if we're going to go, we have to apply it retroactively on all components of this. And I believe that that would be appropriate, that the components, both the entrance facility and the direct transport piece, the separate rates, the commission did that. They did make those charges retroactive to the effective date of that order. So some people are going to pay more if we agree with you. Is that right, some carriers, some SELACs? The average increase in the rates for SELACs was about 7% if the combined weight was applied to carriers that used both. With them broken apart the way the commission did it, it put the 1998 rates back into effect because the parties argued in the Phase 2A supplemental case that it was too difficult to make an adjustment to the combined rate, and therefore it was easier for the commission just to go back and use the 1998 rates, or better, I should say. Okay. Any further questions? Thank you for your arguments. I want to thank all of you for your excellent briefing in this matter. It's a very interesting case with a lot of interesting issues. And thank you for coming here today, for accommodating the change in time, and the case will be submitted for decision.
judges: Thompson, Thomas, Berzon